754 So.2d 311 (2000)
STATE of Louisiana, Appellee,
v.
Andrew ROBINSON, Appellant.
No. 32,794-KA.
Court of Appeal of Louisiana, Second Circuit.
March 1, 2000.
*313 Indigent Defender Office by Pamela G. Smart, Shreveport, Counsel for Appellant.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Hugo A. Holland, Jr., Tommy J. Johnson, Assistant District Attorneys, Counsel for Appellee.
Before CARAWAY, PEATROSS & KOSTELKA, JJ.
PEATROSS, J.
Defendant, Andrew Robinson, was charged by amended indictment with second degree murder as defined by La. R.S. 14:30.1(A)(1) and 14:30.1(A)(2)(a). After a jury trial, Defendant was found guilty as charged. The trial court sentenced Defendant to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
*314 Defendant now appeals, urging eight assignments of error. For the reasons stated herein, Defendant's conviction and sentence are affirmed.

FACTS
On December 9, 1997, Mario Bradford ("Mario") was killed by a gunshot wound to the head. There is no dispute that Defendant pulled the trigger of the gun that killed Mario. The primary question on appeal centers around whether the State met its burden of proof on the charge of second degree murder.

The Testimony
On the night of the shooting, Mario, Kevin Mims ("Kevin"), Larry Mitchell ("Larry"), James Barfield (Mario's father)("Barfield") and Barfield's girlfriend were listening to music and smoking marijuana in Barfield's apartment at 455 Egan Street in Shreveport. At trial, Kevin testified to the following events of that evening. Someone knocked on the door of the apartment and stated that his name was "Andre." No one in the apartment knew anyone named Andre so Kevin told the people in the apartment not to open the door and asked Barfield to get a gun because the situation seemed strange to him. Kevin then heard someone stumble down the stairs outside the apartment. Seconds later, two gunshots were fired through the window of the apartment. After the shots were fired, everyone in the apartment ducked down. Kevin then got Barfield's gun, exited the apartment and went downstairs to investigate.
Once Kevin was downstairs, he saw a man, who he later identified as Defendant, walking down the driveway holding a black revolver to Mario's head with his right hand. Mario's pants were pulled down to his knees and he was having difficulty walking. No one in the apartment, including Kevin, had seen Mario leave the apartment through the only door, so Kevin concluded that Mario must have exited the apartment through a window. A later search of the apartment revealed an open bathroom window adjacent to a drain pipe leading to the ground.
According to Kevin, his 1988 Chevrolet Caprice was between him and Defendant and Mario. Defendant told Kevin to drop his gun because he "had his boy." Kevin then ducked down in front of his car. Defendant and Mario were a few feet behind the car. Kevin heard a gunshot, saw a muzzle flash through the tinted back window of his car and could no longer see Mario. Defendant then ran around the passenger side of the car toward Kevin with his gun pointed at him. Kevin raised Barfield's gun up from his side and shot at Defendant. Kevin testified that Defendant fired at him, but did not hit him. Kevin did not know at the time if he had hit Defendant. Defendant then turned and fled up the driveway. Kevin testified that Defendant must have bumped into the stairs of the apartment as he was fleeing because the railing was damaged. Kevin further testified that, initially, he chased after Defendant, but heard more gunshots and turned and ran back toward the apartment. Kevin ran upstairs, but then remembering Mario, turned and went back downstairs to find Mario lying on the ground behind his car with a gunshot wound to the head. Kevin stayed at the scene until the police arrived several minutes later.
According to Kevin, Defendant was wearing dark clothing and a cap with the letter "S" on it. Kevin further testified that Defendant left his cap and gun at the scene. Mario was wearing a pair of white jeans. Kevin testified that Mario normally wore a herringbone gold chain which measured a quarter to a third of an inch in width.
Sergeant Glen Randall Mitchell of the Shreveport Police Department ("SPD") responded to the shooting. While Sgt. Mitchell was at the scene, he was approached by a female who told him that there was a white T-shirt that belonged to Mario and a necklace in front of her house, *315 which was 80 yards east of the scene. Sgt. Mitchell secured the T-shirt in a bag. On the day prior to trial, Sgt. Mitchell opened the bag in the presence of the prosecutor and noticed that there were some pieces of gold metal inside it. The gold pieces appeared to be a clasp from a necklace and pieces of a necklace. The necklace, also secured at the scene, was gold, approximately a quarter inch wide and missing a clasp.
Larry corroborated Kevin's testimony concerning the events inside the apartment and the knock on the door. When the shots were fired through the window, he fell to the ground. Larry did not see Mario leave the apartment and, like Kevin, concluded that Mario must have exited the apartment through the bathroom window.
After Larry fell to the floor, he went to the window which faced the street. Larry saw Kevin's car and observed Kevin rush out the door and down the stairs. After that, Larry only heard voices. According to Larry, Mario was screaming, "He got me." Larry did not hear Kevin say anything. Larry then heard a gunshot from behind Kevin's car and saw sparks fly up from behind the car. Seconds later, Larry heard more shots being fired. Larry testified that he was armed with a gun and began shooting in the direction of the driveway. When the gunfire ceased, Larry went downstairs and discovered Mario behind Kevin's car.
As a result of the altercation between Defendant and Kevin, Defendant was shot in each of his hands and his shoulder. He went to Louisiana State University Medical Center ("LSUMC") seeking medical attention for those wounds. Pursuant to its policy whereby the police department is contacted whenever a gunshot victim seeks medical attention, LSUMC contacted the SPD regarding the shooting of Defendant. Detective Scott Porter, an investigator with the SPD, received the call concerning a shooting that had reportedly occurred in the Queensboro area of Shreveport. Apparently, on arrival at LSUMC, Defendant had fabricated the story of his shooting, stating that it had occurred in the Queensboro area. When Detective Porter received the call, he was informed that the victim of the alleged Queensboro shooting was at LSUMC. Detective Porter identified Defendant as the victim of that shooting.
On arriving at LSUMC, Detective Porter was advised that Defendant was accompanied by two other individuals. One of the individuals Detective Porter interviewed was Felsy Tyson. Based on the statement Detective Porter took from Mr. Tyson, he testified that he did not believe that the shooting took place in Queensboro.
Detective Porter then spoke with Defendant. Detective Porter testified that Defendant told him that he and Mr. Tyson were in the Queensboro area. Defendant also told Detective Porter that he had allowed Mr. Tyson to borrow his vehicle and, as Defendant was walking down Greenwood Road, he was shot by individuals in a different vehicle. Defendant was unable to give a description of the vehicle that the shooters were driving and described the shooters only as black males.
According to Detective Porter, the statements made by Defendant and Mr. Tyson were completely different. At that point, therefore, Detective Porter began to look at Defendant as someone other than a possible victim. Detective Porter then went outside LSUMC to look for the vehicle that transported Defendant to the hospital. Before examining the vehicle, Detective Porter was approached by his sergeant, who advised him that there was an eyewitness to the Egan Street shooting, Charles Dean Haywood ("Haywood"), who may be able to identify the vehicle which left the scene of the Egan Street shooting as the same vehicle in which Defendant was transported to the hospital.
Haywood, a resident of the 400 block of Jordan Street, which is near the site of the shooting, heard the gunshots that night. *316 A minute or so after the shots were fired, Haywood heard a car speeding east down Jordan Street. Haywood then heard someone yelling for the car to stop. At that point, Haywood went to the window and saw a car pass in front of his house and a man standing off the curb on Jordan Street, directly across the street from his house. Haywood testified that, although he did not get a good look at the man, he did recognize the car as an early 1980's model Buick or Oldsmobile that was white or beige. Haywood testified that the most distinctive feature of the car was that the left front fender was discolored as if it had been replaced. Five to ten minutes after the shooting, Haywood flagged down two police cars and gave the officers a description of the car. On learning about Haywood's having seen the vehicle, Detective Porter requested that Haywood come to LSUMC and see if he could identify the vehicle. Haywood testified that he had no doubt that the vehicle he was shown was the same vehicle he had seen on Egan Street at the time of the shooting.
At that point, Detective Porter testified that he believed that Defendant was lying and was a possible suspect in the Egan Street shooting. Detective Porter then constructed a line-up and showed it to Kevin who positively identified Defendant as the person who shot Mario.

The Expert Testimony
Dr. George McCormick was accepted by the trial court as an expert in forensic pathology. Dr. McCormick examined Mario and concluded that he died of swelling of the brain caused by a gun shot wound to the right side of the head. Dr. McCormick removed the bullet, which he described as a large caliber bullet with a stainless steel jacket, from Mario's head. Dr. McCormick also found two fragments of the bullet and another fragment of the jacket at the final resting place of the bullet. Based on his examination of Mario and the stippling found on Mario's face, Dr. McCormick estimated that the barrel of the gun was 6 to 18 inches from Mario when it was fired.
Richard Beighley, a criminalist with the North Louisiana Crime Lab ("Crime Lab"), was accepted by the trial court as an expert in the field of firearms examination and analysis. The Crime Lab assisted with the investigation of this matter and received the bullets from the coroner's office the SPD.[1]
Mr. Beighley determined that the bullet taken from the apartment at 455 Egan Street (State's Exhibit 33) was fired from the .357 magnum Smith and Wesson revolver (".357")(State's Exhibit 30). Mr. Beighley determined that the bullet removed from Mario's head (State's Exhibit 31) was also fired from the .357. Mr. Beighley testified that, although the bullets he received as State's Exhibits 31 and 33 were damaged, the damage was not so extensive that he could not make a positive identification. Mr. Beighley further explained that "stippling" refers to marks on the skin which are caused when partially burned or unburned gun powder is hot and comes in contact with the skin when it exits the muzzle of a weapon. According to Mr. Beighley, stippling is found if the muzzle to target distance is less than 18 inches. After viewing an autopsy photo of Mario, Mr. Beighley testified that he observed stippling on Mario's face. Finally, Mr. Beighley testified that he found gun powder residue on Mario's clothing, which included a pair of boxer shorts, a pair of jeans, a sleeveless T-shirt, a pair of socks and a pair of tennis shoes.
*317 Connie Lee Brown, a forensic D.N.A. analyst for the Crime Lab, was also accepted by the trial court as an expert. Ms. Brown examined bloodstain evidence, including the .357 and a swab with a bloodstain collected from that gun. Ms. Brown also examined bloodstains collected from Kevin's Chevrolet Caprice at the crime scene, as well as a sweatshirt worn by Defendant and two reference samples. One reference sample was from Defendant and the other was from Mario. Ms. Brown explained that she compared the results from the known reference samples with the results from the evidence.
Ms. Brown determined that the genetic markers taken from the bloodstain on the.357 were consistent with Defendant. She explained that the statistical analysis estimated that the possibility that another African-American individual could have this combination of genetic markers was one in 8.2 quadrillion. She further testified that the same was true of the blood that was taken from the vehicle and the sweatshirt.
Officer Amy Chrietzberg is a crime scene investigator with the SPD. Officer Chrietzberg was accepted by the trial court as an expert in the area of crime scene analysis and blood spatter analysis in particular. Officer Chrietzberg conducted an investigation at the scene of the shooting.
Officer Chrietzberg testified as follows regarding her observations at the scene. Initially, she observed a very large pool of blood and a white towel lying on the concrete behind the back bumper of the Caprice. Officer Chrietzberg also observed a Smith and Wesson .357 revolver lying on the ground between the Chevrolet Caprice and the back staircase. Officer Chrietzberg noticed that the railing of the staircase, which was painted orange, was leaning and broken. According to Officer Chrietzberg, the barrel of the .357 discovered at the crime scene had an orange scrape. Officer Chrietzberg testified as to her belief that the scrape was created when the orange railing of the staircase was damaged. She also observed a green metal chair next to the front door of the downstairs apartment and noticed that it contained a bullet hole. The bullet passed through the chair and hit the building. Officer Chrietzberg observed that there were two bullet holes in the frame of a window located half way up the stairs at 455 Egan Street. The glass was broken out of the window. According to Officer Chrietzberg, the holes were created by bullets being fired into the window of the apartment. Officer Chrietzberg found a spent bullet inside the apartment on the bottom of the windowsill. A second bullet, which split into several pieces, was found in the ceiling and the far wall. Officer Chrietzberg also recovered a .38 caliber Taurus from inside the apartment which she found on a couch positioned near a window which leads out the front of the apartment. All six rounds of the Taurus had been fired. Officer Chrietzberg further observed that the screen of the front window of the apartment had holes which appeared to have been created by a gun being fired from inside the apartment. This suspicion was corroborated by Larry's testimony described earlier.
Also recovered from the scene was a black baseball cap with the letter "D" on the front of it. Based on the statements of witnesses, Officer Chrietzberg determined that the cap belonged to Defendant.
Finally, Officer Chrietzberg observed bloodstain evidence on the front right corner of the Chevrolet Caprice, on the edge of the hood, on the passenger's door, behind the passenger's window and on the rear corner of the vehicle.
From her observations and analysis of the scene, Officer Chrietzberg concluded that Mario was shot where the pool of blood was found behind the Chevrolet Caprice because there was no trail of blood that led to the pool and there was no blood running down Mario's clothes. Officer Chrietzberg further concluded that, after Mario was shot, he had nothing else to do *318 with any shots that may have been later fired.
Regarding Defendant, Officer Chrietzberg concluded that, based on the bloodstain evidence, at some point, Defendant had the .357 in his hand. Based on the bloodstain evidence on the vehicle, Officer Chrietzberg determined that Defendant was shot at the front corner of the vehicle and then went toward the rear of the vehicle. Officer Chrietzberg also concluded that Defendant ran into the railing next to the vehicle, scratched the .357 and then dropped it. Officer Chrietzberg noted that all six rounds from the .357 had been fired at the point when it was dropped by Defendant. Officer Chrietzberg concluded, therefore, that there was no possibility that Defendant could have been shot and then shot Mario at the rear of the vehicle.

DISCUSSION
As a preliminary matter, we note that Defendant failed to brief assignments of error numbers 1, 3 and 4. These assignments of error, therefore, are considered abandoned and will not be discussed. URCA 2-12.4; State v. Schwartz, 354 So.2d 1332 (La.1978); State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writ denied, 558 So.2d 1123 (La.1990).

Assignment of error number 2: Denial of Defendant's Motion for Post-Verdict Judgment of Acquittal and/or Modification of Verdict
By this assignment of error, Defendant contends that the evidence was insufficient to convict him of second degree murder. Defendant filed a "Motion for Post-Verdict Judgment of Acquittal and/or Motion for Modification of Verdict," which was denied by the trial court. La.C.Cr.P. art. 821 provides that a motion for post verdict judgment of acquittal will be granted only if the court finds that the evidence, viewed in a light most favorable to the State, does not reasonably permit a finding of guilty. This is a question of legal sufficiency. State v. Combs, 600 So.2d 751 (La.App. 2d Cir.1992), writ denied, 604 So.2d 973 (La.1992).
When issues are raised on appeal, both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333; State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La. 1992).
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations *319 made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra; State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App.2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.6/26/98), 719 So.2d 1048. Evidence of flight, concealment and attempt to avoid apprehension indicates consciousness of guilt. State v. Davies, 350 So.2d 586 (La.1977); State v. Daniels, 614 So.2d 97 (La.App. 2d Cir.1993), writ denied, 619 So.2d 573 (La.1993).
Defendant raises several arguments which he contends show that the State did not prove his guilt beyond a reasonable doubt under either theory of second degree murder. First, Defendant claims that the State failed to prove that the shooting occurred during the commission of a second degree kidnapping as defined in La. R.S. 14:44.1. Defendant argues that the State did not prove there was a forcible carrying and seizing of Mario away from or back to the apartment. Defendant further argues that the State presented no evidence that Mario was used as a shield or hostage. We disagree on both counts.
Second degree murder is defined, in pertinent part, as "... the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of... second degree kidnapping ... even though he has no intent to kill or to inflict great bodily harm." La. R.S. 14:30.1. Second degree kidnapping is defined, in pertinent part, as follows:
Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:
(1) Used as a shield or hostage; ...
B. For purposes of this Section, kidnapping is:
(1) The forcible seizing and carrying of any person from one place to another;...
La. R.S. 14:44.1.
We conclude from our review of the record that the evidence, viewed in the light most favorable to the prosecution, shows that Defendant shot and killed Mario during the commission of a second degree kidnapping. Kevin testified that he saw Defendant "walking" down the driveway holding a black revolver to Mario's head. Additionally, Sgt. Mitchell testified that a white T-shirt and necklace believed to belong to Mario were recovered down the street from the crime scene. La. R.S. 14:44.1 does not require that the distance traveled during the forcible seizure be any particular distance. State v. Steward, 95-1693 (La.App. 1st Cir.9/27/96), 681 So.2d 1007. Thus, the State proved that there was a forcible carrying and seizing of Mario by Defendant. Kevin further testified that Defendant told him to drop his gun because he "had his boy." We believe this to be evidence that Defendant used Mario as a "shield or hostage." From this evidence, a reasonable trier of fact could conclude that Defendant shot and killed Mario during the commission of a second degree kidnapping.
Defendant also claims that the State failed to prove that he had the specific intent to kill Mario. In support of this argument, Defendant points out that neither Kevin nor Larry saw Mario leave the apartment and that both concluded that he exited the apartment through the bathroom window. Defendant contends, therefore, that no one knew whether Mario was armed with a weapon when he exited the apartment. Defendant argues that Mario probably armed himself before leaving the *320 apartment since he felt that there was enough trouble brewing for him to leave the safety of the apartment through a bathroom window. Defendant emphasizes that the testimony of both Kevin and Larry established that there were other guns in the apartment. Essentially, Defendant argues that it is not known whether Mario attacked him first; and, therefore, it is not known whether the two were arguing such that Defendant lost his "self-control and cool reflection" and he is only guilty of manslaughter, a violation of La. R.S. 14:31. Defendant also contends that the State did not prove what happened just prior to the shot that killed Mario since Kevin's perception of what he saw was through two tinted windows while crouched in front of the car. Defendant finds further support for his position in the inconsistency of several witnesses' testimony regarding the number of shots fired and the sequencing of the shots fired. Based on the entire record before us, we find no merit in Defendant's argument.
Second degree murder is defined, in pertinent part, as "... the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1. Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act. La. R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. McCray, 621 So.2d 94 (La.App. 2d Cir. 1993). Specific intent need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of Defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Fuller, 414 So.2d 306 (La.1982); State v. Doby, 540 So.2d 1008 (La.App. 2d Cir.1989), writ denied, 544 So.2d 398 (La.1989).
Again, we conclude that the evidence, viewed in the light most favorable to the prosecution, reveals that Defendant possessed the specific intent to kill Mario. Defendant pointed the .357 at Mario's head and pulled the trigger. The shot was fired at close range. Defendant's act of pointing a gun at Defendant's head while firing it is evidence from which a reasonable person could conclude that he had a specific intent to kill. State v. Guy, 95-0899 (La.App. 4th Cir.1/31/96), 669 So.2d 517, writ denied, 96-0388 (La.9/13/96), 679 So.2d 102. See State v. Stringfellow, 28,074 (La.App.2d Cir.5/8/96), 674 So.2d 1036, in which this court stated that the firing of a buckshot from a shotgun at fairly close range was alone sufficient evidence of specific intent to kill or inflict great bodily harm for a second degree murder conviction.
Regarding Defendant's assertion that he killed Mario in self defense, we note that self defense is justification for a killing only if the person committing the homicide reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. La. R.S. 14:20(1); State v. Cotton, 25,940 (La. App.2d Cir.3/30/94), 634 So.2d 937; State v. Jones, 600 So.2d 875 (La.App. 1st Cir. 1992), rev. denied, 92-2351 (La.5/12/95), 654 So.2d 346. The State has the affirmative duty of proving beyond a reasonable doubt that the killing was not in self defense. State v. Arnold, 30,282 (La.App.2d Cir.1/21/98), 706 So.2d 578.
We find no support in the record for Defendant's argument that Defendant may have been justified in using deadly force against Mario. No witnesses saw Mario with a weapon, nor was one found in the area or on his body that could be traced to him. There was no evidence that Mario fired shots at Defendant. The facts that the witnesses' testimony differed as to the number of shots fired was a credibility determination to be made by the jury. Defendant led Mario up the driveway while pointing a gun at his head. At the time that Defendant shot Mario, Mario had his pants pulled down around his knees *321 and he was having trouble walking. Furthermore, Defendant fled the scene and attempted to conceal his involvement in the shooting when he was questioned by the police at LSUMC. From this evidence, a reasonable trier of fact could conclude that Defendant did not shoot and kill Mario in self defense.
As previously stated, Defendant argues, in the alternative, that he should be found guilty of not more than manslaughter. Manslaughter is defined as a homicide which would be murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31. "Sudden passion" and "heat of blood" are mitigating factors in the nature of a defense. State v. Lombard, 486 So.2d 106 (La.1986); State v. McCray, supra. A defendant is required to prove by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood" for a verdict of manslaughter to be appropriate. Lombard, supra; McCray, supra. In reviewing a defendant's claim that he has met that burden, the appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that these mitigatory factors had not been established by a preponderance of the evidence. Lombard, supra; State v. Lewis, 28,973 (La.App.2d Cir.12/11/96), 685 So.2d 1130, writ denied, 97-0122 (La.5/16/97), 693 So.2d 797.
Defendant, however, cannot point to any particular action by Mario which would constitute provocation sufficient to deprive him of his self-control. Defendant did not show by a preponderance of the evidence that Mario threatened him in any way or that he and Mario were involved in an argument.
From this evidence, or lack thereof, a reasonable trier of fact could conclude that Defendant possessed the specific intent to kill or to inflict great bodily harm required for a conviction of second degree murder and that the killing was not in self defense and that Defendant did not act in "sudden passion" or "heat of blood."
This assignment of error is without merit.

Assignment of error number 6: Selection of Grand Jury Foreperson and Validity of Amended Indictment[2]
By this assignment of error, Defendant first contends that the system for selecting grand jury forepersons pursuant to La. C.Cr.P. art. 413(B) encourages race-based decision-making by judges and is, therefore, unconstitutional. Pursuant to La. C.Cr.P. art. 413(B), the trial court judge selects the foreperson from the grand jury venire before the remaining members of the grand jury have been chosen by lot. Defendant argues that this system allows a trial court judge to select a foreperson whose views will be closer to that of the judge than those of an African-American citizen. Defendant contends that, if the system for selecting grand jury forepersons *322 is infected with racial discrimination, doubt is then cast over the fairness of all decisions made by that grand jury.
Any objections arising from the selection of the grand jury foreperson are treated as ones alleging discriminatory selection of grand jurors. Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998). All equal protection claims arising out of the selection or composition of grand juries in Louisiana remain subject to this state's procedural requirements. Deloch v. Whitley, 96-1901 (La.11/22/96), 684 So.2d 349. Any equal protection claim that is not asserted in a pre-trial motion to quash is waived. Id., citations omitted.
The record in the case sub judice is void of a pre-trial motion to quash the indictment filed on behalf of Defendant. Since Defendant did not preserve this objection by filing such a motion, the objection was waived and may not be considered on appeal.
In this assignment, Defendant also challenges the State's having amended the grand jury indictment from a charge of first degree murder to second degree murder prior to trial without bringing the amended indictment back before the grand jury. On January 14, 1998, Defendant was originally indicted for the first degree murder of Mario, a violation of La. R.S. 14:30. On June 19, 1998, an amended indictment was filed charging Defendant with the second degree murder of Mario, a violation of La. R.S. 14:30.1(A)(1) and La. R.S. 14:30.1(A)(2)(a). Defendant contends that once an indictment has been returned, its charges may not be broadened through amendment except by the grand jury. Defendant argues that he was prejudiced by the amended indictment which constituted a substantive defect; and, therefore, pursuant to La.C.Cr.P. art. 487(A), he should have been granted a mistrial. We find no merit in Defendant's argument.
Examination of prospective jurors in this matter began on October 26, 1998. The amended indictment was filed on June 19, 1998, prior to the commencement of the jury trial. Thus, if the trial court had ordered the amendment of the indictment due to a defect of substance, it could have done so since this was prior to the commencement of the jury trial. La.C.Cr.P. art. 487.
In addition, the greater charge of first degree murder includes all of the elements of the lesser charge of second degree murder. Thus, it is permissible to amend the indictment by reducing a charge from first degree murder to second degree murder. State v. Davis, 385 So.2d 193 (La.1980); State v. Brown, 29,708 (La.App.2d Cir.9/24/97), 702 So.2d 744, rev. denied, 97-2549 (La.1/30/98), 709 So.2d 703.

Assignment of error number 7: Jury Charge on General Intent
By this assignment of error, Defendant contends that the trial court erred in instructing the jury regarding general criminal intent. Defendant complains of the following jury instructions which were read by the trial court to the jury:
ARTICLE 10. CRIMINAL INTENT
Criminal intent has been referred to in this case. The law of Louisiana provides:
Criminal intent may be specific or general:
(1) Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.
(2) General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.
Although intent is a question of fact, it need not be proven as a fact, and may *323 be inferred from the circumstances of the case. Intent need not be proven by direct evidence. It is not possible to look into a person's mind and discover his intention. It may be inferred from the circumstances.
Defendant contends that, when these jury instructions are viewed collectively, there is a possibility of prejudice. Defendant argues that jurors could easily interpret the instructions to mean that specific and general intent always coexist. Thus, the jurors could have believed that specific intent could be inferred from a finding of general intent. Defendant argues that the trial court erred in giving the jury instruction regarding general criminal intent because it is not applicable to the offense of second degree murder or any lesser included offense of second degree murder. Defendant argues in the alternative that the trial court should have given the jury special instructions that specific criminal intent is not present simply because general criminal intent is present.
The record reveals that Defendant did not request special jury instructions or object to the jury charges at trial. Having failed to object timely, Defendant is precluded from asserting this error on appeal. La.C.Cr.P. arts. 801, 841(A); State v. Washington, 30,866 (La.App.2d Cir.8/19/98), 716 So.2d 936, rev. denied, 98-2473 (La.1/8/99), 734 So.2d 1229.
We note, however, that, even if this court were to consider Defendant's contention, it would be without merit. The trial court instructed the jury regarding criminal intent by reading to it the law of this state. The statute is clear and does not imply that specific intent and general intent always coexist. The statute only states that general intent is present when there is specific intent and not the converse. Defendant is correct that second degree murder is a specific intent crime. We believe, however, that any error on the part of the trial court in including the instruction on general intent was harmless in light of the overwhelming evidence against Defendant.[3]

Assignment of error number 8: Errors at Sentencing
In this assignment, Defendant first contends that the trial court failed to comply with La.C.Cr.P. art. 894.1(C) in that it did not articulate the mitigating or aggravating factors it considered in sentencing him to the mandatory sentence of life imprisonment provided by statute. First, we must note that Defendant failed to file a motion to reconsider sentence. La.C.Cr.P. art. 881.1, Motion to Reconsider Sentence, therefore, precludes Defendant from presenting arguments to the court of appeal which were not presented to the trial court. Thus, this court should not consider Defendant's claim. We will, however, briefly address his argument.
La.C.Cr.P. art. 894.1(C) provides that, "The court shall state for the record *324 the considerations taken into account and the factual basis therefor in imposing sentence." It is not error, however, for the trial court to fail to articulate reasons for the sentence, as set forth in La.C.Cr.P. art. 894.1(C), when imposing a mandatory life sentence. Since the trial court had no discretion in imposing the life sentence, articulating factors or reasons would be an exercise in futility. State v. Jones, 31,613 (La.App.2d Cir.4/1/99), 733 So.2d 127, rev. denied, 99-1185 (La.10/1/99), 748 So.2d 434. La. R.S. 14:30.1 provides that, "Whoever commits the crime of second degree murder, shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence." The trial court sentenced Defendant, in accordance with the mandatory statute, to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Defendant's argument is without merit.
Defendant next contends that the trial court violated La.C.Cr.P. arts. 766 and 905.2 by not compelling the State to make an opening statement during the penalty phase of his trial. Defendant argues that, because the State did not mention the evidence presented to the jury during the sentencing phase of his trial, his right to know that the State has proven its case beyond a reasonable doubt was violated.
Again, since Defendant failed to file a motion to reconsider sentence, La.C.Cr.P. art. 881.1 operates to preclude him from presenting this argument on appeal. We do note, however, that La.C.Cr.P. art. 905.2, cited by Defendant, applies to sentencing in capital cases. This is not a capital case; thus, La.C.Cr.P. art. 905.2 is not applicable in the instant matter. Furthermore, Defendant was aware that the State had met its burden of proving its case against him beyond a reasonable doubt when he was convicted during the guilt phase of the trial.
This assignment of error is without merit.

Assignment of error number 5: Error Patent
Defendant's fifth assignment was a request for this court to review the record for errors patent. This request is unnecessary since such a review is made automatically in all criminal cases. State v. Bryant, 29,344 (La.App.2d Cir.5/7/97), 694 So.2d 556; State v. Stamper, 615 So.2d 1359 (La.App. 2d Cir.1993), modified on other grounds, 624 So.2d 1208 (La.1993). After a review of the record, no errors patent were noted.

CONCLUSION
For the reasons stated herein, Defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] State's Exhibit 31 is the bullet, bullet jacket fragment and four lead fragments received from the coroner's office. The bullet was a large caliber bullet with a stainless steel jacket removed from Mario during the autopsy. State's Exhibit 33 is the bullet received from the Shreveport Police Crime Scene Investigation Unit. State's Exhibit 30 is a firearm received by the Shreveport Police Crime Scene Investigation Unit. The firearm is a .357 magnum Smith and Wesson revolver. State's Exhibit 32 is a firearm received by the Shreveport Police Department. The firearm is a .38 caliber Taurus.
[2] At this point, we believe it is necessary to note that Defendant was granted leave of court to file a supplemental brief to assert these arguments which were not initially assigned as error. In accord with the well-established jurisprudence of the supreme court, this court should not consider these arguments since they were neither assigned as error nor related to error patent on the face of the record. State v. Williams, 319 So.2d 404 (La.1975); State v. Overton, 596 So.2d 1344 (La.App. 1st Cir.1992), writ denied, 599 So.2d 315 (La.1992). This jurisprudence, however, may not apply to pro-se filings in light of State v. Melon, 95-2209 (La.9/22/95), 660 So.2d 466, which held that courts must accept and consider post-verdict pro-se filings from unrepresented defendants. Since Defendant's supplemental brief was filed pro-se, we will consider his additional assignments of error. For purposes of this opinion, we will discuss Defendant's first supplemental assignment of error as assignment number six, his second supplemental assignment of error as assignment number seven and his third supplemental assignment of error as assignment number eight.
[3] Defendant further argues that the trial court's jury instructions regarding intent prejudiced him by shifting the burden to him to prove that he lacked the requisite intent. Specifically, Defendant complains that the burden was shifted to him when the trial court instructed the jury that "you may infer that Defendant intended the natural and probable consequences of his acts." For authority, Defendant cites Sandstrom v. Montana, 442 U.S. 510, 524, 99 S.Ct. 2450, 2459, 61 L.Ed.2d 39 (1979). Nowhere in the trial court's instructions in the case sub judice, however, do we find the charge of which Defendant complains. Regarding the jury's allowed inference of intent, in addition to the general charge on intent quoted earlier in this opinion, the trial court charged the jury as follows:

The intent need not have existed for any material length of time. It is sufficient if it was in the mind of the accused at the time of the commission of the act. You may consider all of the evidence in the case which you believe bears on the question of intent of the defendant in order to reach a conclusion as to any criminal intent. I instruct you that specific intent is an essential element of the crime of Second Degree Murder.
We do not find any error in the above instruction.