960 So.2d 318 (2007)
STATE of Louisiana, Appellee
v.
Eddie LANG, Appellant.
No. 42,125-KA.
Court of Appeal of Louisiana, Second Circuit.
May 30, 2007.
*319 Louisiana Appellate Project by Paula Corley Marx, Lafayette, Mark Owen Foster, for Appellant.
Jerry L. Jones, District Attorney, Charles L. Brumfield, Assistant District Attorney, for Appellee.
Before BROWN, WILLIAMS and DREW, JJ.
DREW, J.
Eddie Lang was convicted of second degree murder (La. R.S. 14:30.1) and sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. He appeals. We affirm.

FACTS
Around midnight on November 27, 2004, Eddie Lang, along with his sister and brother-in-law, were waiting in line to pay for admittance into a Morehouse Parish nightclub. Lang's sister, Felecia[1] Adams, paid the cover charge for all three. Terrence Armstrong, the victim, falsely claimed that the admission had been paid for him.
Events then moved in rapid succession:
 Lang and Armstrong exchanged words and fought;

*320  Lang pulled a gun, which he pointed at the victim;
 Armstrong broke away from the struggle and went inside the club, telling the owner and a security guard at the door that someone outside had a gun;
 Armstrong asked several patrons for a weapon, without success;
 Lang entered the club, where he found his sister sitting at a table;
 Armstrong hit him, commencing round two;
 Lang shot Armstrong and fled the club;
 Armstrong died shortly thereafter.
Lang was later identified as the shooter and thereafter apprehended in California.
I. Sufficiency
A. Law
Our law on sufficiency is well settled.[2]
Relative to the facts of this tragedy, in order to prove the crime of second degree murder, the state's burden was to prove beyond a reasonable doubt that defendant acted in accordance with the circumstances listed in La. R.S. 14:30.1(A), which provides in pertinent part:
Second degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm.
Our law on self-defense is well settled.[3]
*321 The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, U.S. cert. denied; State v. Dooley, 38,763 (La.App.2d Cir.9/22/04), 882 So.2d 731, writ denied, 04-2645 (La.2/18/05), 896 So.2d 30.
B. Testimony
(1) Sergeant Clint Hall of the Morehouse Parish Sheriff's Office testified that:
 he responded to the call at the Townhouse Club on November 27, 2004, shortly after midnight;
 another officer arrived at the same time and they entered the club together;
 there was only one entrance to the club;
 nearly all of the 100 patrons were attempting to exit the building;
 when he reached the back of the club, most of the patrons were gone;
 he saw a black male on the floor, still alive, but unable to speak;
 someone ran into the club and said there was a fight outside the club;
 he went outside to investigate, but found no activity;
 when he went back inside the club, he found a 9mm shell casing under a speaker near the bathroom, approximately 3½ feet from the victim;
 the casing was collected by Investigator Derrick Quillar;
 medical personnel took Armstrong to Morehouse General Hospital; and
 he (Sgt.Hall) had no further involvement in the investigation.
On cross-examination, Sgt. Hall testified that:
 when he arrived, the owner and a female were helping patrons leave the club;
 he obtained the name of a possible suspect (Lang), whose address was obtained from driver's license records; and
 attempts to locate Lang at the listed address were unsuccessful.
(2) Investigator Derrick Quillar testified that:
 he was the lead investigator on this case;
 he arrived between 12:15 and 12:30 a.m., at which time he was briefed;
 few patrons were left inside the club when he arrived;
 Armstrong had already been transported to the hospital;
 he took charge of the scene, ordering everyone (except the owner and a barmaid) out of the club, to preserve the crime scene;
 he found and photographed one 9mm shell casing on the scene;
 the casing was never linked to the shooting;
 no weapons were found at the scene;
 he learned from several uncooperative individuals that Lang was the shooter;
 he noted that blood had been cleaned from the floor prior to his arrival;
 he went to the hospital and learned that Armstrong had died;
 he took several post-mortem photographs of the victim;
 Armstrong had one obvious gunshot wound;

*322  officers were initially unsuccessful in locating Lang;
 an arrest warrant was obtained for Lang;
 officers were unable to locate Lang in Louisiana, but based on an anonymous tip, he was eventually located in California, one month after the shooting; and
 as evidence in the case, Quillar received a copy of the autopsy report, a bullet recovered from the victim's body, and a DNA matrix card.
(3) Dr. Frank Peretti, an expert in forensic pathology, testified that:
 he performed the autopsy;
 the cause of death was a gunshot wound to the chest and abdomen area;
 a large bullet, consistent with a 9mm, was taken from the victim's body;
 the bullet entered the victim's left side just under the rib cage and traveled to the right and downward to the buttocks area;
 the wound was a distant gunshot wound, as no gunshot residue was visible on the victim's clothing, although no testing was conducted on the clothing;
 the wound was consistent with the gun being held by the victim and turned back towards him because of the downward path of the bullet;
 the wound could have been inflicted in several manners;
 the victim's blood alcohol content was 0.114 percent at death; and
 with the exception of the alcohol and medicines given as a result of attempted life-saving procedures, no other drugs were found in the victim's blood.
(4) Wanda Brandley testified that:
 she was a patron at the club on the night of the shooting;
 she knew both Lang and the victim;
 her brother and Lang were best friends;
 she was outside the club before the shooting and saw the initial fight near the door;
 she didn't see the fight start, but she did see Lang point a gun at Armstrong;
 the victim then ran inside the club;
 the owner went outside to check on the commotion, but the fight was over;
 she thought (not sure) that Lang's gun jammed as he aimed it at the victim;
 she then lost sight of Lang, but guessed he went around the building's side;
 she reentered the club, noticing Lang do the same;
 afraid of more trouble, she watched Lang the entire time he was in the club;
 fifteen to 20 minutes later, Lang and the victim were standing near each other;
 she heard the sound of a gunshot and saw Lang shoot the victim, then pull the hood of his shirt over his head and exit the club with the crowd;
 she told Investigator Quillar that she didn't see Lang shoot the victim;
 she saw Lang and the victim standing near each other when she heard the gunshot, but she had not seen the pair "tussling" inside the club;
 there were a lot of people in the club at the time of the shooting;
 after the victim was shot, she went over and talked to him;
 though unfamiliar with weapons, she remembered the gun being black;

*323  she heard the gunshot, but did not see the gun "go off";
 Lang entered the club 10-15 minutes after the victim;
 she and her brother David went to the hospital; and
 Lang was wearing a hooded shirt and a T-shirt at the time of the shooting.
(5) Tamika King testified that:
 she was at the Townhouse Club with friends on November 27, 2004;
 she saw the victim rush into the club, pushing her and scratching her arm;
 she did not know the victim prior to the incident;
 as the victim rushed past, she heard him say that "he got a gun";
 the victim spoke with the owner of the club and the police officer[4] who was also present;
 the victim did not appear excited;
 the victim spoke with his cousin, who was a friend of hers; and
 she did not see the victim talking to anyone else while he was inside the club.
(6) David Brandley, brother of Wanda Brandley, testified that:
 he was in the club on the night of the shooting, standing outside talking when he saw the victim and Lang "tussling" near the club's entrance;
 he saw Lang pull out a black gun, at which point the victim broke away and ran into the club, with Lang following close behind;
 he did not see any type of fight between the victim and Lang inside the club, but he saw Lang pull a gun out of his pocket and shoot the victim;
 though he had told police that Lang and the victim were struggling over the gun, he said at trial that the two were standing five to six feet apart at discharge; and
 he was certain Lang shot the victim, and the victim did not shoot himself during a struggle over the weapon.
(7) Eddie Harris, a co-owner of the club, testified that:
 he was working the door on the night of this shooting;
 when the victim entered the club, he said someone outside had a weapon;
 the victim did not tell him about the fight or who had a gun;
 he and the security person walked outside to look around, but saw nothing;
 there were about four individuals standing outside, and when he questioned them regarding a possible disturbance, they did not reply;
 he reentered the club, and soon heard a gunshot in the rear of the club;
 the patrons rushed the door, and he was unable to see what was happening;
 he saw the victim lying on the floor at the back of the club; and
 he stopped club patrons from attempting to move the body.
(8) James Armstrong, cousin of the victim, testified that:
 he was in the club when the victim came in asking for a weapon because someone was trying to kill him;
 he did not have a weapon to give the victim;
 he told the victim to "chill out," thinking he was just drunk;
 when Lang approached him, he told him to "leave that alone";

*324  Lang and the victim fought inside the club, then Lang shot the victim; and
 he was about two feet away from the fight, but he did not see who started it.
(9) Gloria Ellington, Lang's mother, testified that:
 she took photographs of Lang's face, at his request, showing the injuries he received that night, including swelling, scratches, and bloodshot eyes;
 she did not know how or when her son had been injured;
 after taking the photos, she did not see her son for three to four weeks;
 during his absence, she heard that Lang was in California; and
 she denied helping her son leave the state, but admitted that she tried to persuade him to stay out there.
(10) Priscilla Porter testified that:
 she was present when the pictures of Lang's injuries were taken;
 she saw several scratches on Lang at the time, but the scratches were not visible in the photographs; and
 she was able to identify some of Lang's injuries, but did not know how or when Lang was injured.
(11) Andrea Henderson testified that:
 after entering the club that night, he went to the bar and had several beers;
 he saw two people struggling near a table where "Felecia" was sitting;
 he did not know that Felecia and Lang were related;
 he did not know Lang or the victim; and
 after seeing a gun, he left the club.
(12) Felecia Adams, Lang's sister, testified that:
 she went to the club with her husband and her brother;
 she paid the admission for herself, her husband, and Lang;
 the victim tried to claim that she paid for his admission;
 she quickly told the attendant that she had in fact paid for her brother;
 she did not know the victim;
 she and her husband then entered the club without her brother;
 Lang entered later, and came over to their table;
 James Armstrong was standing near their table as Lang entered the club;
 she heard Lang tell Armstrong that Mr. Armstrong should "get his cousin";
 she told Quillar about this conversation in her initial statement;
 she saw the victim hit Lang, causing Lang to lose his balance, but not fall;
 Lang and the victim began to struggle;
 she heard a gunshot, though she never saw a gun;
 she heard the victim ask someone at her table for a gun prior to the shooting;
 after the shooting, she ran home from the club; and
 she was unable to locate her brother after the shooting and did not see or hear from him again until after his incarceration in December 2004.
C. Reasoning
The evidence presented by the state was sufficient to support Lang's conviction for second degree murder. Lang argues without a basis in fact that uncontradicted evidence showed that the victim was the aggressor in the fight that occurred outside the club, and again when he initiated the continued fight inside, after inquiring about a weapon. The reality is that the jury was presented with exhaustive *325 and uncontradicted testimony that Lang and the victim fought outside and Lang pulled a gun which he pointed at the victim. After the outside fight, there was confusing testimony as to whether the victim did go inside the club and request a weapon. It is clear that his search was without success.
The jury was required to make an ultimate determination of this issue, and they did so, apparently rejecting the argument that the witnesses were biased. In particular, the defendant attacks the state's witnesses because of their relationships with the victim and because of the discrepancies in their respective accounts of the shooting. The jury chose to believe the testimony of the state's witnesses, rejecting the claim of self-defense. Testimony indicated that Lang had in fact pointed the weapon at the victim during the first struggle. Lang then entered the club and argued with the victim's cousin. Shortly thereafter, he shot the victim. The fight was neither of such a long duration, nor so violent, that Lang could have believed his life was in danger. Additionally, Lang's injuries were apparently minor in that the photographs taken the night after the incident did not depict any major injuries. The state met its burden to sustain this conviction.
II. Manslaughter Argument
Lang argues that he acted in sudden passion or heat of blood after being beaten by the victim and thus should have been convicted of manslaughter as opposed to second degree murder. The state responds that the issue of whether the killing was in fact a manslaughter is one to be determined by the jury after consideration of all mitigating factors shown by the evidence.
Manslaughter is defined, in relevant part, as a "homicide which would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La. R.S. 14:31 A(1); State v. Quiambao, 36,587 (La.App.2d Cir.12/11/02), 833 So.2d 1103, writ denied, 03-0477 (La.5/16/03), 843 So.2d 1130.
A defendant is required to prove by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood" for a verdict of manslaughter to be appropriate. State v. Robinson, 32,794 (La.App.2d Cir. 3/1/00), 754 So.2d 311, writ denied, 00-0989 (La.3/23/01), 787 So.2d 1008.
"Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. State v. Lombard, 486 So.2d 106 (La.1986).
Considering the sufficiency argument regarding the finding of second degree murder, and viewing the evidence in a light most favorable to the prosecution, the evidence does not substantiate Lang's contentions. While it was established that Lang and the victim were engaged in a minor argument and later a fight, it is difficult to extrapolate these facts into partially excusing Lang's conduct, by reducing a second degree murder conviction to manslaughter. The mitigating factors were not established by a preponderance of the evidence, and the jury rejected the option of returning a verdict of manslaughter. We agree with the jury's findings. Manslaughter is inappropriate under these facts.
*326 III. Juror Misconduct: Inadequate Record and Insufficiency of Counsel
Failure to Make a Record of Bench Conferences
Lang complains that:
 a prospective juror spoke prejudicial remarks that were heard by other jurors;
 a related bench conference was not recorded; and
 his lawyer did not sufficiently inquire about this to prospective jurors.
La. C. Cr. P. art. 843 provides:
In felony cases, in cases involving violation of an ordinance enacted pursuant to R.S. 14:143(B), and on motion of the court, the state, or the defendant in other misdemeanor cases tried in a district, parish, or city court, the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.
State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, 00-1609 (La.6/14/00), 768 So.2d 592, U.S. cert. denied, held:
This court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La. C. Cr. P. art. 843. Still, art. 843's description of "objections" and "arguments" will normally apply only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments rise to a level of materiality sufficient to invoke art. 843. Similarly, Art. I § 19's command to record "evidence" does not encompass bench conferences, at least, not ones that do not satisfy the materiality requirements of La.Code Crim. Proc. art. 843. (Internal citations omitted.)
See discussion in State v. Draughn, 05-1825 (La.1/17/07), 950 So.2d 583.
La. Const. art. I, § 19 provides that "[n]o person shall be subjected to imprisonment . . . without the right of judicial review based upon a complete record of all evidence upon which the judgment is based."
Lang points to no specific prejudice resulting from:
 the agreed procedure utilized in deciding the issue, or
 the trial court failing to record bench conferences, or
 defense counsel's failure to make a proper record. State v. Hoffman, supra.

A defendant is not entitled to relief absent a showing of prejudice based on the missing portions of the transcripts. State v. Castleberry, 98-1388 (La.4/13/99), 758 So.2d 749, U.S. cert. denied.
Our law on effectiveness of counsel is well settled.[5]
*327 On the second day of voir dire, the state requested permission to approach the bench, and a brief bench conference with all counsel was held. Afterwards, the trial court brought prospective juror Bornett into court, whereupon he was questioned by the court, the defense, and the state.
During the questioning, the record reveals that the prospective juror:
 said something heard by prospective jurors and by a sheriff's deputy, and
 his statement was ". . . seems like they know he did it and everything, he's guilty, so it shouldn't be hard to, you know."
Defense counsel requested another bench conference, then questioned Bornett further, and then Bornett was excused for cause.
There was then a discussion as to how the matter should be handled, with the court determining that the remaining 13 prospective jurors would initially be questioned together. The trial court stated, "I don't want to set off worms in their head that would infect the jury with his (Mr. Bornett's) poor statement and inappropriate conduct but I want to get some guidance from you." The court indicated it would give further instructions regarding the presumption of innocence. Defense counsel requested that the court ask if any of the prospective jurors had in fact heard the statement, and if any answered affirmatively, that they be questioned privately. This eminently reasonable procedure was followed by the court.
Of the 13 prospective jurors, six indicated being present when the deputy spoke with Bornett in the grand jury room, and of these six, only two actually heard Bornett's statement. The others said they heard the deputy tell Bornett that the case should not be discussed. From the six prospective jurors who were questioned individually, three were selected to serve, with one serving as an alternate.
*328 While Lang argues that the trial court should have recorded the bench conferences that led to the questioning during voir dire, the record does not support Lang's contention that there was any error made by the trial court or Lang's trial attorney in handling this issue. While it would have been better to record the bench conference, the material aspects of these arguments are ascertainable from the record presented. Lang alleges unfairness and a patent inability of this court to meaningfully review the proceedings below, all because a record of these questions and answers was not made:
 how the bailiff became aware of the statement;
 how many people were in the room at the time;
 to whom Bornett made the statement; and
 whether the other person commented on his statement.
The record belies Lang's arguments. Though it is known that Bornett made a statement regarding Lang's guilt, the record also reflects that the entire panel was called and consisted of 13 prospective jurors who were called for voir dire. Any others present in the room would be irrelevant for the purposes of this court making a determination of the issue. While it could be potentially helpful to know who Lang was speaking to when he made the statement, that information is not material for a determination of this issue. Those who heard the comment, and even those who only heard the bailiff's subsequent admonishment informed the court of this fact on the record. We find no prejudice here, and appreciate the learned trial court soliciting input from counsel on the resolution of a knotty problem.
Lang argues, contrary to the record, that trial counsel was ineffective in failing to extensively question the prospective jurors regarding these comments. Under the standards of Strickland, Lang fails to meet the first prong of the test.[6] There is no showing that the defense counsel should have asked any additional questions of the individuals who indicated they had in fact heard the comments. The rationale and the strategy employed by the court and defense counsel were reasonable, being purposely enacted to prevent defense counsel from being cast in a negative light because of questions regarding the matter. This was an appropriate strategy for conducting voir dire. Lang was not deprived of effective representation.

DECREE
The defendant's conviction and sentence are AFFIRMED.
NOTES
[1] Also appears in the record spelled as "Felicia."
[2] When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488, writ denied, 02-2634 (La.9/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
When the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Matthews, 464 So.2d 298 (La.1985).
[3] Self-defense is justification for a killing only if the person committing the homicide reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. La. R.S. 14:20(1); State v. Cotton, 25,940 (La.App.2d Cir.3/30/94), 634 So.2d 937; State v. Jones, 600 So.2d 875 (La.App. 1st Cir.1992), writ denied, 92-2351 (La.5/12/95), 654 So.2d 346.

When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State ex rel. D.P.B., 02-1742 (La.5/20/03), 846 So.2d 753.
[4] An off-duty sheriff's deputy, moonlighting as a club security officer.
[5] As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief ("PCR") in the trial court than by appeal. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. State ex rel. Bailey v. City of West Monroe, 418 So.2d 570 (La.1982); State v. Williams, 33,581 (La.App.2d Cir.6/21/00), 764 So.2d 1164. When the record is sufficient, this issue may be resolved on direct appeal in the interest of judicial economy. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Willars, 27,394 (La.App.2d Cir.9/27/95), 661 So.2d 673.

The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. State v. Wry, 591 So.2d 774 (La.App. 2d Cir.1991). A claim of ineffectiveness of counsel is analyzed under the two-prong test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
To establish that his attorney was ineffective, the defendant first must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. The relevant inquiry is whether counsel's representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. Strickland, supra. The assessment of an attorney's performance requires his conduct to be evaluated from counsel's perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment. State v. Moore, 575 So.2d 928 (La.App. 2d Cir.1991). Also State v. Tilmon, 38,003 (La. App.2d Cir.4/14/04), 870 So.2d 607, writ denied, 04-2011 (La.12/17/04), 888 So.2d 866.
Second, the defendant must show that counsel's deficient performance prejudiced his defense. This element requires a showing the errors were so serious as to deprive the defendant of a fair trial, i.e., a trial whose result is reliable. Strickland, supra. The defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. Strickland, supra; State v. Pratt, 26,862 (La.App.2d Cir.4/5/95), 653 So.2d 174, writ denied, 95-1398 (La.11/3/95), 662 So.2d 9. A defendant making a claim of ineffective assistance of counsel must identify certain acts or omissions by counsel which led to the claim; general statements and conclusory charges will not suffice. Strickland, supra; State v. Jordan, 35,643 (La. App.2d Cir.4/3/02), 813 So.2d 1123, writ denied, 02-1570 (La.5/30/03), 845 So.2d 1067.
[6] That counsel's performance was deficient. Here, it clearly was not.