WILLIAMS, J.
 

 h The defendant, Joseph M. Breaux, was charged by a grand jury indictment with armed robbery, a violation of LSA-R.S. 14:64, and conspiracy to commit armed robbery, a violation of LSA-R.S. 14:26. Following a jury trial, he was convicted as charged. He was adjudicated a fourth felony offender and was sentenced to serve life in prison, without benefit of probation, parole or suspension of sentence on both charges. The sentences were ordered to be served concurrently. For the following reasons, we affirm.
 

 FACTS
 

 On April 19, 2008, at approximately 11:33 p.m., Officer T.J. Bryant, of the Ru-ston Police Department, responded to a
 
 *808
 
 report of a single-vehicle accident in the 800 block of South Maple Drive. Officer Bryant arrived on the scene and observed a 2001 Kia Rio in a ditch, overturned on its roof. The driver of the vehicle, Uchenna Ezike, was lying in a pool of blood inside the vehicle. Ezike was airlifted to Louisiana Health Sciences Center in Shreveport, Louisiana, where he subsequently died.
 

 Lieutenant Stephen Beard, also of the Ruston Police Department, was called to the scene to investigate the accident.
 
 [1]
 
 Lt. Beard examined the vehicle and noticed blood inside the vehicle, running in a downward direction from the top of the vehicle to the bottom of the vehicle.
 
 [2]
 
 Considering that the vehicle was in an overturned position, the blood 12pattern indicated to Lt. Beard that Ezike had been injured prior to the accident. He suspected that the injuries to the back of Ezike’s head were not consistent with injuries sustained in a low-impact car accident. Subsequently, Lt. Beard examined the vehicle more closely to determine what may have caused Ezike’s injuries. There were no signs of gunshots, and no weapons were found in or around the vehicle.
 
 [3]
 

 Lt. Beard’s suspicions were further heightened when he did not find any of Ezike’s personal effects, such as a wallet, credit cards or cellular phone. On April 24, 2008, Lt. Beard accompanied Ezike’s brother to Chase Bank and recovered Ez-ike’s bank records. The bank records revealed that four credit/debit card transactions were made at a Circle K store on April 20, 2008, one day after the accident.
 

 Further investigation led police officers to two suspects: Laterica Hardy (“Hardy”) and Adrianna Gipson (“Gipson”). Hardy and Gipson both gave statements to the police, denying any involvement in the crime. Subsequently, both admitted that they, along with the defendant, had robbed Ezike. The testimony revealed that on the day of Ezike’s accident, Hardy, Gipson and the defendant attended a barbeque at the home of the defendant’s girlfriend, Nicole Gipson (“Nicole”). Looking to make some quick money, Gipson suggested that they “hit a lick” (find someone to rob). During the discussion, Hardy suggested someone she knew, Ezike, as the target.
 

 IsHardy called Ezike and enticed him to meet her in a park by offering to have sex with him. The defendant armed himself with a stick, and he, Hardy and Gipson left Nicole’s house together.
 
 [4]
 
 Hardy drove the defendant and Gipson to a local park and left them there. Hardy soon returned with Ezike trailing her in his vehicle. Hardy and Ezike sat in Ezike’s vehicle talking. The defendant approached Hardy and asked if she had a cigarette. Feeling uncomfortable, Ezike requested that they leave the park. As Ezike exited his vehicle to accompany Hardy back to her car, the defendant approached Ezike and began hitting him in the head with the stick. Ezike fell to the ground, and the defendant continued to strike him. The defendant took Ezike’s wallet, two cell phones and “a
 
 *809
 
 little money” from his pockets. The defendant and Gipson then ran away. Hardy testified that she waited until Ezike got up and into his vehicle before she left the scene.
 

 Hardy, Gipson and the defendant returned to Nicole’s house and divided the proceeds from the robbery. Soon thereafter, the defendant went to a Circle K store on Farmerville Highway and used Ezike’s credit/debit card to purchase gas and cigarettes.
 
 [5]
 
 A short time later, the defendant, Hardy and Gipson returned to the store, and Gipson used one of Ezike’s credit/debit cards to purchase additional items.
 

 On May 19, 2008, the defendant, Hardy and Gipson were charged with one count of armed robbery and one count of conspiracy to commit |4armed robbery.
 
 [6]
 
 Following a jury trial, the defendant was convicted as charged. He was adjudicated a fourth felony offender and was sentenced to serve life in prison, without benefit of probation, parole or suspension of sentence on both charges. The sentences were ordered to be served concurrently. The defendant appeals.
 

 DISCUSSION
 

 Reverse-Batson
 

 The defendant contends the trial court erred in sustaining the state’s “reverse-
 
 Batson
 
 ” challenge. The defendant argues that the state made a “bare-bones” re
 
 verse-Batson
 
 claim, “without complying with the procedural requirements of
 
 Bat-son.”
 
 According to the defendant, the state failed to meet its burden of showing that the defendant’s use of strike backs, to strike certain potential jurors, was racially motivated.
 

 The accused shall have a right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. The number of challenges shall be fixed by law. La. Const. Art. 1, § 17. In trials of offenses punishable by death or necessarily by imprisonment at hard labor, each defendant shall have twelve peremptory challenges, and the state twelve for each defendant. LSA-C.Cr.P. art. 799. LSA-C.Cr.P. art. 799.1 refers to the practice of “Strike backs” and provides:
 

 Notwithstanding any other provision of law to the contrary, and specifically notwithstanding the provisions of Article 788 [
 
 7
 
 ], in the jury selection process, the state Land the defendant may exercise all peremptory challenges available to each side, respectively, prior to the full complement of jurors being seated and before being sworn in by the court, and the state or the defendant may exercise any remaining peremptory challenge to one or more of the jurors previously accepted. No juror shall be sworn in until both parties agree on the jury composition or have exercised all challenges available to them, unless otherwise agreed to by the parties.
 

 
 *810
 
 It is well settled that the use of peremptory challenges based solely on a juror’s race is prohibited.
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The
 
 Batson
 
 decision is codified in LSA-C.Cr.P. art. 795, which provides, in pertinent part:
 

 [[Image here]]
 

 C. No peremptory challenge made by the state or the defendant shall be based solely upon the race or gender of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race or gender, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory race or gender neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.
 

 D. The court shall allow to stand each peremptory challenge exercised for a race or gender neutral reason either apparent from the examination or disclosed by counsel when required by the court. The provisions of Paragraph C and this Paragraph shall not apply when both the state and the defense have exercised a challenge | nagainst the same juror.
 

 E. The court shall allow to stand each peremptory challenge for which a satisfactory racially neutral or gender neutral reason is given. Those jurors who have been peremptorily challenged and for whom no satisfactory racially neutral or gender neutral reason is apparent or given may be ordered returned to the panel, or the court may take such other corrective action as it deems appropriate under the circumstances. The court shall make specific findings regarding each such challenge.
 

 The
 
 “reverse-Batson
 
 ” rule states that the defendant is also prohibited from engaging in racial discrimination in the use of peremptory challenges.
 
 Georgia v. McCollum,
 
 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992);
 
 State v. Knox,
 
 609 So.2d 803 (La.1992).
 

 In
 
 State v. Draughn,
 
 2005-1825 (La.1/17/07), 950 So.2d 583, the proper reviewing process for a
 
 Batson
 
 claim, as recently described by the supreme court, was set forth as follows:
 

 A defendant’s
 
 Batson
 
 challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, ‘[t]he second step of this process does not demand an explanation that is persuasive, or even plausible’; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating ‘the persuasiveness of the justification’ proffered by the prosecutor, but ‘the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.’
 

 Id.
 
 at 600 (internal citations omitted).
 

 To establish a
 
 prima facie
 
 showing for a
 
 Batson
 
 challenge: (1) the |7objecting party must demonstrate that the challenge was directed at a member of a cognizable group; (2) the objecting party must then
 
 *811
 
 show the challenge was peremptory rather than for cause; and (3) finally, the objecting party must show circumstances sufficient to raise an inference that the challenging party struck the venire person on account of being a member of that cognizable group.
 
 State v. Givens,
 
 99-3518 (La.1/17/01), 776 So.2d 443;
 
 Price v. Cain,
 
 560 F.3d 284 (5th Cir.2009).
 

 Establishing a
 
 prima facie
 
 showing is the first step of the
 
 Batson
 
 analysis and it is satisfied by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. The objecting party does not have to show that “more likely than not” the peremptory challenge was based on impermissible group bias.
 
 Johnson v. California,
 
 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005). The burden upon the objecting party is therefore a “light burden,” for purposes of establishing a
 
 prima facie
 
 case.
 
 Price, supra.
 

 The trial court plays a unique role in the dynamics of a
 
 voir dire,
 
 for it is the court that observes firsthand the demeanor of the attorneys and venire persons, the nuances of questions asked, the racial composition of the venire, and the general atmosphere of the
 
 voir dire
 
 that simply cannot be replicated from a cold transcript.
 
 State v. Juniors,
 
 2003-2425 (La.6/29/05), 915 So.2d 291,
 
 cert. denied,
 
 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006);
 
 State v. Myers,
 
 99-1803 (La.4/11/00), 761 So.2d 498. A reviewing court owes the district judge’s evaluations of discriminatory intent great deference and should not reverse them unless they are clearly |Rerroneous.
 
 Hernandez v. New York,
 
 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991);
 
 Batson,
 
 476 U.S. at 98, n. 21, 106 S.Ct. 1712.
 

 In the instant case, three panels of 15 potential jurors, for a total of 45 potential jurors, were questioned. Once 12 potential jurors were tentatively accepted, both the defense and the State exercised “strike backs.” When the defense exercised a strike back against tentative juror, Staci Woodard, the state lodged a reverse-
 
 Batson
 
 challenge, stating that the defense had used eight strike backs, all against potential jurors who were Caucasian.
 
 [8]
 
 The colloquy was as follows:
 

 [State]: Your Honor, according to my notes, and please correct me if they’re in error, I do notice that there have been eight strike backs offered by the defendant^
 
 [9]
 
 ] All of those have been against jurors who are Caucasians. There has been no challenge at all, either a cause for peremptory or any strike back issues by the defendant against any of the African-American jurors.
 

 The Court: All right. I have not been asking for reasons for strike backs but since there is the
 
 Batson,
 
 I will allow that.
 

 [[Image here]]
 

 The Court: [The state] has filed a — or lodged a
 
 Batson
 
 objection, subsequent to the request — or peremptory challenge of the defendant on Ms. Woodard, which was the most recent one that he challenged. That would be number eight. We can have a hearing and it may necessarily — it may be necessary to do so. Or what I can do, [defense counsel], is ask — probably go in reverse order so
 
 *812
 
 that your memory’s more clear, if you’d like, and let you give me the reasons for exercising peremptories and I can make a decision based on that. Anybody have any objection to that?
 

 Instate]: No, sir.
 

 [Defense]: I don’t have any objection to it, your Honor.
 

 [[Image here]]
 

 The defense proceeded to state the following reasons for exercising the strike backs:
 

 Staci Woodard
 
 — Defense counsel stated that he “represented the defendants who broke into her house and caused she and her entire family great grief, and she’s going to realize any minute now. And I don’t want to be the defense lawyer when she realizes that I was the one that represented those guys.... ”
 

 James Glass
 
 — Defense counsel noted that Mr. Glass was a juror on a federal jury trial in which [the prosecutor’s] husband presided; in that case, Mr. Glass found the defendant guilty. Defense counsel stated “I will testify that it had nothing to with the fact that Mr. Glass is a Caucasian if, in fact, he is such.”
 

 Graham Kozar
 
 — Defense counsel argued that Mr. Kozar stated that he knew Mr. Brown, one of the assistant district attorneys, and he would rather have a juror who did not know any of the assistant district attorneys.
 

 James Lord
 
 — Defense counsel stated that Mr. Lord performed unsatisfactory plumbing work in his house, and the two did not part on cordial terms.
 

 Jeffrey Mitcham
 
 — Defense counsel stated that “Mr. Mitcham knew too many police officers for my liking. And I don’t remember the other specifics.”
 

 Beverly Richmond
 
 — Defense counsel stated, “I don’t know that I need to give an argument for striking a white woman.... I didn’t strike her because she was white.” When asked by the Court, “Why did you?” Defense counsel responded, “I’ve got numbers here and I just don’t remember ... Body language — I really don’t’ remember, Judge[.]”
 

 John Colvin Allen
 
 — Defense counsel stated that he did not think Mr. Allen had a proper understanding of presumptions of innocence and reasonable doubt. Counsel also stated, “I was not impressed with his ability 1 into render a fair, impartial jury verdict, although he testified that he could.” Counsel further stated that “[Allen is] a big, large, burly guy that if I had my druthers, I’d rather have somebody else....”
 

 Charles Vernon Smith
 
 — Defense counsel stated that “he’s a DA’s investigator and I — am partial against DA investigators.”
 
 Patsy Boles
 
 — Defense counsel noted that Ms. Boles went to school and church with [the prosecutor], and that she has been a victim of a crime. Counsel further stated “and it didn’t have anything to do with the fact that she was a white lady if, in fact, she was.”
 

 Following arguments, the trial court ruled that the defense had provided race and gender neutral reasons for striking seven of the nine tentative jurors. With regard to Allen and Richmond, the court allowed the defense another opportunity to prove race and gender neutral reasons for exercising back strikes. The defense counsel responded as follows:
 

 I would reiterate that my excusing Ms. Richmond and Mr. Allen had nothing to do with their race. That I was willing to accept them until I determined that because of the way both sides were exercising their challenges for cause, as well
 
 *813
 
 as their peremptory challenges, it appeared highly probable that more — the jurors that I would be more satisfied with were coming up in the pool. And it appeared that the jury would be made up in such a fashion regardless of race, color, creed, or national origin that it would be more beneficial to the defense, and for that reason I excused Ms. Richmond and the same for Mr. Allen.
 

 The court ruled that the defense had not offered race and gender neutral reasons for excusing Richmond and Allen, stating that it felt “like race and gender were playing a role in the defendant’s exercise of peremptory challenges.” As a consequence for its finding of a
 
 Batson
 
 violation, the court stated that the defense was required to articulate race | nand gender neutral reasons for any additional strike backs. Following the
 
 Batson
 
 inquiry, the defense peremptorily struck two additional jurors, and the court granted both challenges. Richmond and Allen were not seated on the jury, despite the court’s finding of a
 
 Batson
 
 violation.
 

 We have reviewed this record, and we find that the trial court followed the proper
 
 Batson
 
 three-step analysis. We find no error in the trial court’s initial finding that the state had established a
 
 prima facie
 
 showing of a
 
 Batson
 
 violation. The first step of the
 
 Batson
 
 analysis, a
 
 prima facie
 
 showing, is satisfied by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. See,
 
 Johnson v. California, supra; Price v. Cain, supra.
 

 As noted above, after the defense exercised its ninth peremptory challenge, the state argued that the defense had exercised all strikes against Caucasians, but had neither challenged for cause nor exercised a peremptory challenge for any potential juror who was African-American. The court accepted the state’s argument as a
 
 prima facie
 
 showing that the strike backs were based on race. Accordingly, the court ordered the defense to provide race and gender neutral reasons for the strike backs, to which the court accepted seven of the nine reasons. The court considered the defense’s proffered explanations and accepted seven of the explanations. However, the court rejected the explanations with regard to two potential jurors, expressing that it “felt like race and gender were playing a role in the defense’s exercise of peremptory challenges.” In light of the
 
 Batson
 
 violation concerning those two potential jurors, the court ordered that any [^further strike backs had to be accompanied with race and gender neutral reasons. However, the court did not order those two potential jurors to be reseated.
 

 The record reveals that the trial court’s ruling on the
 
 Batson
 
 issue was carefully considered. The record does not support the defendant’s assertion that the trial court did not comply with “procedural requirements of
 
 Batson.”
 
 The trial court found no discriminatory intent in all but two of the defendant’s peremptory challenges. With regard to the remaining two strike backs, defense counsel was unable to articulate a race neutral reason for exercising the challenges; therefore, the court found a discriminatory intent. Again, we note that the two potential jurors were not reseated on the jury; thus, the defendant was not prejudiced by the court’s ruling. This assignment lacks merit.
 

 Secret Ballot
 

 The defendant also contends the trial court erred in denying the jury’s request for “paper slips” to enable the jury to vote by secret ballot. The defendant argues that the trial court improperly interfered with the jury’s deliberations “by
 
 *814
 
 telling the jury that it could not vote the way it wanted to vote.” Without citing any relevant law, the defendant further argues that the trial court’s denial of the paper slips “affected [his] constitutional right to fair and untainted jury deliberations.”
 

 LSA-C.Cr.P. art. 802 provides:
 

 The court shall charge the jury:
 

 (1) As to the law applicable to the case;
 

 (2) That the jury is the judge of the law and of | iSthe facts on the question of guilt or innocence, but that it has the duty to accept and to apply the law as given by the court; and
 

 (8) That the jury alone shall determine the weight and credibility of the evidence.
 

 The court shall not charge the jury concerning facts of the case and shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted. LSA-C.Cr. P. art. 806.
 

 We can find no basis in the law to support the defendant’s argument that the trial court’s denial of the jury’s request to vote by “secret ballot” constituted a violation of the defendant’s right to a fair trial. The only legal mandate for a jury’s use of “slips of paper” that we could find is set forth in LSA-C.Cr.P. art. 812, which pertains to the polling of a jury,
 
 after
 
 a verdict has been delivered. That article provides, in pertinent part:
 

 [[Image here]]
 

 (2) The procedure for the written polling of the jury shall require that the clerk hand to each juror a separate piece of paper containing the name of the juror and the words “Is this your verdict?” Each juror shall write on the slip of paper the words “Yes” or “No” along with his signature. The clerk shall collect the slips of paper, make them available for inspection by the court and counsel, and record the results. If a sufficient number of jurors as required by law to reach a verdict answer “yes” the clerk shall so inform the court. Upon verification of the results, the court shall order the clerk to record the verdict and order the jury discharged. If an insufficient number required to find a verdict answer “Yes,” the court may remand the jury for further deliberation, or the court may declare a mistrial in accordance with Article 775.
 

 The defendant’s argument that the jury’s deliberations were tainted is |i4not supported by the record. The record reveals that prior to giving instructions to the jury, the trial court stated:
 

 Once we have [read the instructions], the principal jurors will go to the jury room and begin their deliberations and be sequestered until they reached [sic] a verdict. You will leave everything else out here, your cell phones; any communication devices will not be taken with you. I will give you a writing implement to take with you.
 

 The court then proceeded to instruct the jury with regard to,
 
 inter alia,
 
 the presumption of innocence, the standard of proof, credibility of witnesses, the relevant law and the responsive verdicts to the crimes charged. The court then stated:
 

 There are no limitations on your deliberations, except you are confined to the evidence in the case and the law given you by the Court. When it comes time for you to decide on a verdict, each juror must arrive at his own individual and separate conclusion and must vote his separate and individual conscience.
 

 Before you retire, the Court, I, will hand you two verdict forms on one page.
 
 *815
 
 Each form contains the responsive verdicts that I have mentioned. Each form is for each count.
 

 Ten of you must agree on the same verdict per form, and it must and can only be one of those listed on each form handed to you. When you have reached your verdicts, and at least ten of you have agreed on each verdict, your foreman shall write that verdict as those words appear on the front of the form.
 

 [[Image here]]
 

 The jury then retired to the jury room for deliberations. Prior to returning a verdict, the jury sent a communication to the trial court, requesting “paper slips in order to take secret ballots.” Outside of the presence of the jury, the court stated:
 

 Jurors do not have the right, as I am understanding — able | lsto understand it, to vote in secret. There might be a technical argument that they could initially vote that way but that’s a slim, technical argument.
 

 Their deliberations are between and among themselves. It’s private within there, but I don’t know that they can do secret ballot. I don’t think they have that luxury. And certainly their — even their individual decisions aren’t secret when they come back into the courtroom with their verdict.
 

 When the jury returned to the courtroom, the court stated, “As concerns communication number two, request paper slips in order to take secret ballots: The answer to that is no.”
 

 The trial court made no comments designed to influence or “taint” the jury’s deliberations in any way. The court did not instruct the jury how to vote, nor did it comment upon evidence or give an opinion. Additionally, prior to deliberations, the court specifically instructed the jury that, “there are no limitations on your deliberations except you are confined to .the evidence in the case and the law given by the court.” Within those parameters, the jury had free rein on how to deliberate. The denial of paper slips did not alter or taint this freedom.
 

 Furthermore, the jury was properly instructed to vote their own conscience. The court’s denial of the jury’s request for paper slips did not interfere with the jury’s deliberations; the court did not comment on the facts or evidence nor did the court give its opinion when it denied the request. Furthermore, the defendant cites no authority for the proposition that the jurors must be allowed to vote by secret ballot. We find that the record does not reflect any interference and/or influence, by the trial court with the jury deliberations. This assignment of error is without merit.
 

 ^CONCLUSION
 

 For the reasons set forth herein, the defendant’s convictions and sentences are affirmed.
 

 CONVICTIONS AFFIRMED; SENTENCES AFFIRMED.
 

 [1]
 

 . Lt. Beard testified that he is called to the scene of any accident involving a fatality or serious injuries.
 

 [2]
 

 . Lt. Beard also found blood on the B-pillar on the driver’s side of the vehicle. The B-pillar is a piece of metal between the front door and back door that supports the roof of the vehicle.
 

 [3]
 

 . A subsequent autopsy revealed that Ezike died from a hemorrhage caused by a fractured skull. The medical examiner determined that the skull fracture was not caused by the automobile accident.
 

 [4]
 

 . Witnesses described the weapon differently. During the testimony, the weapon was described as a "broken shovel handle or broomstick,” a "bat” and a "thick stick” similar to a cane.
 

 [5]
 

 . The footage from the store’s security cameras reflects that the defendant used Ezike’s debit/credit card at Circle K on two separate occasions. He was accompanied by Hardy and Gipson on only one occasion.
 

 [6]
 

 . Hardy and Gipson pled guilty to armed robbery.
 

 [7]
 

 . LSA-C.Cr.P. art. 788 provides, in pertinent part:
 

 A. After the examination provided by Article 786, a prospective juror may be tendered first to the state, which shall accept or challenge him. If the state accepts the prospective juror, he shall be tendered to the defendant, who shall accept or challenge him. When a prospective juror is accepted by the state and the defendant, he shall be sworn immediately as a juror. This Article is subject to the provisions of Articles 795 and 796.
 

 [[Image here]]
 

 [8]
 

 . The defendant is African-American; the victim was Nigerian.
 

 [9]
 

 . Woodard was actually the defendant's ninth strike back. Defense previously exercised strike backs on James Glass, Graham Kozar, James Lord, Jeffrey Mitcham, Beverly Richmond, John Colvin Allen, Charles Vernon Smith and Patsy Boles.