PEATROSS, J.
12Pefendant, Harold Wayne Johnson, appeals his conviction for the second degree murder of his wife, Linda Gail Johnson. For the reasons stated herein, we affirm.

FACTS

Defendant and Ms. Johnson were high school sweethearts who had a child together. The two separated and Defendant enlisted in the army. Following his discharge from the service for reasons related to substance abuse, Defendant -.and Ms. Johnson reunited in 2004 and married in 2007. They lived together in a townhome in Monroe, Louisiana, with their two grandchildren and Ms. Johnson’s young adult daughter, Kendra Barral. Defendant and Ms. Johnson had a tumultuous relationship. According to Kendra, the couple argued frequently over “money, his drug use, him ^staying out late, him just leaving and not coming home.” Until the night of Ms. Johnson’s death, the arguments had never resulted in violence. In May 2008, Defendant wrote his wife this letter:
Hey if our, relationship, marriage, or whatever, is going to be like this. Me not trusting U or U not trusting Me. Let stop f* * ⅞ ⅝ *g with each other before somebody get badly hurt one way or another.
It don’t have to be this way or that.
U for me me for U
Me for me U for U
We got in it together & 'we can get out together without the name calling, fussing, fighting, lying on each other.
*1090 Our problems should have been our problems
Every body know our business

CHILDNESS

I AM TIRED

Ms. Johnson owned a handgun that she kept in her purse, but in mid-June 2008, the gun was missing and was reported stolen. Ms.' Johnson then began to carry a baseball bat in her truck. In addition, Defendant’s drug abuse continued; he drank and used crack cocaine despite efforts by Ms. Johnson to get him to stop.
[ 4At about 10:30 p.m. on the evening of Saturday, August 2, 2008, Ms. Johnson drove her truck to pick up Kendra from work. The two women went back to the townhouse to wait for the father of one of the grandchildren, Anthony Rogers, to pick up the children. When Rogers arrived and took the children, it was late and Defendant had not yet arrived home. Ms. Johnson and her daughter left the townhouse and went searching for Defendant, but were unable to locate him. At approximately 12:15 a.m., Ms. Johnson dropped Kendra off at Kendra’s ex-boyfriend’s house and went home. Just before 2:00 a.m., Kendra and Ms. Johnson spoke on the telephone and Kendra recalled hearing Defendant’s voice in the background.
Rogers went to the townhouse sometime the next morning and discovered that Ms. Johnson was not there, which Rogers found to be highly unusual. Rogers testified that, at that time, Defendant told him that his wife had left home in the early morning hours after the two had argued.
Around 8:00 a.m., Kendra tried to call her mother at home and Defendant answered the telephone. Kendra asked to speak with her mother and Defendant replied that he had not seen her mother since 4:00 a.m. Defendant told Kendra that her mother “just got up and left.” Kendra then telephoned relatives and she and her cousin drove around town trying to find Ms. Johnson.
[¿Kendra and her cousin discovered that her mother was not at work and they returned to the townhouse. There was not anyone there at that time and Kendra noticed several unusual or out-of-place items and that the thermostat was set at 50 degrees. Kendra found a bottle of expensive tequila on a table in the living room; the tequila did not belong to her or her mother. She also found a decorative drinking glass full of liquid. Going further into the house, Kendra discovered a mop and mop bucket which still contained water. According to Kendra, her mother kept a very neat and tidy house and Kendra knew that she would not have left water in the mop bucket. Kendra went upstairs to her mother’s bedroom and discovered it in disarray. The comforter that was normally on the bed was missing, and another comforter had been put in its place; the bed skirt was also missing.
Looking for clues, Kendra pulled the bed away from the headboard. On the headboard, Kendra found a gold-colored can of Miller High Life beer and a pack of cigarettes, both of which she identified as items used by Defendant. In the clothes hamper, Kendra found clean wet towels and testified that her mother would not have put them there because wet towels are prone to mildew.
As Kendra called local hospitals trying to find her mother, Defendant arrived at the townhouse. Defendant went upstairs to the bedroom and [¿became agitated when he saw that the bed had been moved. Kendra noticed that Defendant was drinking out of the same glass that she had seen on the table downstairs. Defendant lay down on the bed and began watching television. Rogers then arrived at the townhouse and he and Defendant left together *1091 to look for Ms. Johnson. They returned without finding her and Rogers related that Defendant bought some crack while they had been looking for her. Rogers then left on his own to resume the search.
At about 3:00 p.m., Monroe Police Department (“MPD”) Officer Stephen Snowberger arrived at the townhouse in response to a call from Defendant. According to the officer, Defendant said that he and his wife had gotten into an argument at about 3:00 a.m. Defendant explained that, following the argument, Ms. Johnson left in her pickup truck and he had not heard from her since that time. The officer noted that Defendant was drinking and also could smell that he was barbecuing outside. The officer returned to the station and entered the missing person report.
That afternoon, the family was notified by police that Ms. Johnson’s pickup truck had been found on the University of Louisiana at Monroe (“ULM”) campus in the parking lot of a dormitory, which was not far from the townhouse. The truck was-simultaneously discovered by Rogers and a Monroe police officer. Ms. Johnson’s purse was found in the truck along 17with her baseball bat; no gun was found in her purse or elsewhere in the truck.
At that point, Kendra decided to move the bed to look for further clues. Defendant had been interfering with earlier efforts to do this; each time a family member would go to that room, Defendant would sit or lie on the bed. Some family members, however, were able to distract Defendant while others lifted the mattress. Kendra was not in the room when the mattress was moved, but she came in the bedroom when she heard screaming and saw a sizable bloodstain between the mattress and box spring where the bloody mattress had been • flipped over. Blood spatter was also later found on the bedroom wall, television, picture frames and bible, which was placed on top of the television. When Defendant heard the screaming and realized that the blood had been discovered, he ran out the back door of the townhouse and fled.
Police and the family searched the area and Defendant was discovered in an abandoned house not far from the townhouse. A search of a nearby dumpster yielded a black trash bag containing the blood-soaked linens that had been on Ms. Johnson’s bed. Various items of men’s and women’s clothing — belonging to Defendant and to Ms. Johnson — were also recovered.
|SMPD transported Defendant to the police station and Defendant gave a statement to Detective Benjamin Baw, in which he admitted to the detective that he and his wife had argued at about 2:00 a.m., and he stated “that’s when I hit her.” At that point, Defendant stopped the interview.
Examination of the Ms. Johnson’s bedroom revealed that bleach had been used to clean one of the walls. Two lines of visible blood on the wall were characterized as “castoff’ blood spatter, meaning blood that is flung from a swinging weapon. Similarly, police found blood in the bed of the victim’s pickup truck.
Shortly after his arrest, Defendant made a phone call from the jail to his sister, Billie White. Calls from the jail, are recorded [1]; and, in the call, Defendant told his sister that “she hit me and I just snapped.... I hit her. I grabbed something and hit.” He said that he used a bottle to hit his wife. He also told his *1092 sister where he had left the body, and he acknowledged that “I don’t think I’ll be getting back out [of jail].” Police searched the location mentioned by Defendant, but found nothing. They then realized that Defendant had mistaken the name of the road and, relying on the description of the road by Defendant, they searched another area and found Ms. Johnson’s partially decomposed body.
liiDuring his time in jail, Defendant spoke with Rogers, who was also in jail at that time. - Rogers testified that Defendant admitted that he used a Seagram’s Gin bottle to kill his wife. Rogers further stated that “he said they just got into an argument and she went to her purse and he hit her across the — you know, and kept hitting her.”
As stated, Defendant was charged with second degree murder and was tried by a jury. During jury selection, Defendant’s attorney exercised five peremptory challenges against female prospective jurors on the first panel of prospective jurors and only accepted two female jurors. The prosecutor raised a reverse-Batson[2] challenge, arguing that Defendant was not allowed to discriminate against female jurors. The court noted the high percentage of excluded females compared with accepted females and found that the prosecutor had made a prima, facie showing of discrimination. Defendant’s attorney then proffered reasons for excluding the jurors:
— Williams: Could not give adequate consideration to a manslaughter verdict;
— Day: not elaborate answers, not wholeheartedly behind her responses concerning burden of proof, right to remain silent, marriage, no connection;
— Harbor: unsolved murder of her aunt;
— Billiot: marriage and evidence against the accused, exposure to pretrial publicity;
lm— Ramsey — “attentive on answer,” recollection about the crime, concern about marriage to victim, shaky on burden of proof.
The prosecutor responded with a variety of arguments directed at the reasons offered by Defendant. The court later considered the arguments on the record. The court accepted Defendant’s reasons for jurors Billiot, Harbor and Day, but rejected his reasons for jurors Ramsey and Williams and ordered those jurors reseated over Defendant’s objection.
Subsequently, the trial court restored the two peremptory challenges to Defendant and rejected a subsequent Batson challenge by the prosecutor when Defendant used one of these strikes against a female juror. Defendant ultimately exercised all of his peremptory challenges.
After the parties questioned the third panel of jurors, the State exercised back-strike peremptory challenges against jurors Ramsey and Williams, the jurors who had been reseated pursuant to the prosecutor’s gender-discrimination challenge. These jurors were excused and did not sit on the jury.
The State presented the evidence as outlined above. In his defense, Defendant elected to testify and explained the long history of his relationship with his wife back to their high school days. Defendant described his problems with drug addiction. He further testified that he had an extramarital lnrelationship with another woman, Pat Lloyd, and that his wife knew about that relationship. Defendant further stated that his wife and mistress had engaged in a physical altercation. Defendant admitted that he and his. wife argued *1093 regularly about various things, such as money and raising their grandchildren.
Defendant further testified that, on the morning of this incident, he had just returned home from the store and he and his wife had gotten into an argument about his whereabouts on the previous night. He stated that his wife had assumed that he was at his mistress’s house. He testified:
And what brought this incident on — we fussing and arguing and she talking about Pat got AIDS and things like that. I don’t know why you messing around with this-she got AIDS and things. And I said, Gail, you know what. Guess what. If she got AIDS, guess who else got AIDS. See what I’m getting at? ... Guess who else got AIDS. And boy that-that struck a nerve. And then, that’s when she. — -I got something for your— and — all this stuff and she reached for her — reached for her purse and that’s when I hit her with the bottle.
... After I hit her with the bottle the first time, the blood, man, I kind of ... kind of lost it.... After that — after that was done, I went in and got the rest of the bottle drinking and what — what I done did? What — I can’t say these words but what the — going on. What the-look what I done got myself into and things like that. Then I start, oh shit. Let me — -shoot, I got to do something here. That’s when I start moving the body. That’s why I moved the body because I thought about them kids, man. After I done — -after I dropped the body off, I came — I washed out the truck. Came and parked the truck and I came home |12and start cleaning up. I couldn’t let them kids — I wasn’t going-— I couldn’t see them kids — didn’t want them kids to come up in there and see— see all that blood. All that blood.
Defendant admitted that he hit his wife first on the hand and she screamed; he then conceded that, at that point, he could have stopped hitting her “if I had been thinking, yes. I probably could - have stopped. But I was — I was — I was out of it by then. During that time,... Rage. Anger. Rage. Yes.”
Examination of Ms. Johnson’s body revealed a blunt injury to her right hand that the medical examiner described as a defensive wound; this was evidently the first injury. Forensic examination showed that Defendant then hit her repeatedly — at least five blows — on'the head and face with a bottle. The resulting injuries were severe and any one. of them would have caused her death; one of these traumas crushed Ms. Johnson’s skull and left a four-inch deep indentation.
Defendant also testified that, after killing his wife, he removed the bed linens, flipped the mattress over and then wiped down the room. He said that he then .had a drink, made some telephone calls asking people if they had seen his wife and began barbecuing in the back yard. Defendant explained that he was not trying to hide evidence from the police, but that he “was in the process of cleaning up really for them kids.”
|1sBy a 10-2 vote, the jury convicted Defendant of second degree murder. The court imposed the mandatory life sentence. This appeal ensued.

DISCUSSION

Assignment of Error No. 1: (verbatim) The verdict of Second Degree Murder in this case is not supported by the evidence, which is insufficient to rebut the defendant’s claim of Manslaughter. The defendant established provocation by constant arguing which troubled his relationship with the victim and combined a substance -abuse illness he had, set -the stage for a tragic homicide. The victim *1094 followed the defendant up and down the stairs and then, hit him and warned him “I’ve got something for you,” reached for a handbag in a threatening manner.
In his first assignment of error, Defendant argues that the evidence was insufficient to 'support the jury’s verdict of second degree murder. He asserts that the evidence showed that the homicide was committed in the heat of blood that deprived him of cool reflection. For this reason, he submits that 'the killing was manslaughter rather than second degree murder.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 U.S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181, unit denied, 08-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, unit denied, 09-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La. App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence |1Rmust be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 09-0372 (La.11/6/09), 21 So.3d 299; State v. Parker, 42,311 (La.App.2d Cir.8/15/07), 963 So.2d 497, unit denied, 07-2053 (La.3/7/08), 977 So.2d 896.
Manslaughter is defined, in relevant part, as a “homicide which would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.” La. R.S. 14:31 A(l); State v. Quiambao, 36,587 (La.App.2d Cir.12/11/02), 833 So.2d 1103, unit denied, 03-0477 (La.5/16/03), 843 So.2d 1130.
A defendant is required to prove by a preponderance of the evidence that he acted in “sudden passion” or “heat of blood” for a verdict of manslaughter to be appropriate. State v. Robinson, 32,794 (La.App.2d Cir.3/1/00), 754 So.2d 311, unit denied, 00-0989 (La.3/23/01), 787 So.2d 1008.
“Sudden passion” and “heat of blood” are not elements of the offense of *1095 manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the | ^homicide is committed without them. State v. Lombard, 486 So.2d 106 (La.1986).
In reviewing a defendant’s claim that he met that burden, the appellate court must determine' whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that these mitigating factors had not been established by a preponderance of the evidence. State v. Robinson, supra; State v. Lewis, 28,973 (La.App.2d Cir.12/11/96), 685 So.2d 1130, writ denied, 97-0122 (La.5/16/97), 693 So.2d 797.
In the case sub judice, Defendant is the sole living witness to the killing. Since Defendant chose to testify, the jury heard his version of the offense in detail. Defendant explained that he and his wife had a habit of arguing and, on the night of her death, his wife was enraged at Defendant because he had suggested that either he or his wife might have AIDS because Defendant’s mistress had ÁIDS. Defendant also told the jury that he struck his wife‘because he saw her reaching for her purse, implying that she might have been reaching for a weapon, although no weapon was found.
The evidence failed to prove that Defendant acted under provocation sufficient to deprive him of cool reflection; indeed, the evidence showed that Defendant, not the victim, was the provocateur. Even accepting Defendant’s 117version of events as true in its entirety — which the jury clearly did not do — his story was insufficient to reduce his culpability for this brutal crime from murder to manslaughter. Defendant, not his wife, had violated the trust of their marriage and had committed adultery with another woman; his extramarital relationship had apparently been ongoing for some period of time. Further, Defendant, by his own admission, knew that his mistress had AIDS, and he, not his wife, made that point in the argument preceding the homicide. Defendant, not his wife, was the party who was goading and antagonizing the other party to the argument. Simply stated, Defendant offered no evidence that his wife had made any statements to provoke his rage.
Moreover, Defendant went to great lengths to cover up any evidence of the crime, even going so far as to report to the police that his wife was missing, hiding her body and cleaning up the scene of the killing. Defendant’s hasty but thorough cleaning job after the crime shows that he had control of himself immediately following his killing of his wife and suggests that whatever provocation he may have been under was not great in degree. Also, Defendant fled from the scene when the crime was discovered and told several different versions of the events to various people.
| lsFinally, we are struck by the brutal nature of the killing. Ms. Johnson’s right hand had a traumatic injury that the medical examiner described as a defensive injury, and this was apparently the first injury she suffered. Significantly, Defendant admitted that he could have stopped hitting his wife at that point, but he said that he was “angry” and in a “rage,” so he continued to beat her until she was dead. The jury apparently concluded that whatever provocation Defendant was acting under evaporated when he continued his assault after he had incapacitated his wife with his first attack.
Based on the physical evidence, the testimony of those closest to the parties and Defendant’s own testimony, we conclude that the jury was well within its discretion *1096 to reject Defendant’s argument that his conviction should have been one of manslaughter rather than second degree murder.
This assignment of error is without merit.’
Assignment of Error No. 2: (verbatim) The record does not include voir dire. The minutes reflect a Batson challenge urged by the State and granted against the defense on gender bias claims, and the minutes make reference to details by indicating as follows “(see record).” Defendant therefore cannot secure assistance of Counsel on Appeal regarding jury selection and this Court should order the record be supplemented to include it.
Supplemental Assignment .of Error No. 5: (verbatim) The trial court erred in granting the Prosecutor’s Reverse Bat-son Challenges. The only factor cited to create a prima facie issue was-the number of peremptory challenges used on female, prospects. The court determined that three of five prospects were validly excused, and the court erroneously held that reasons on the others 119were not “gender neutral.” The defense was prejudiced by the timing of the jurors being re-seated, and the prosecution" did not resolve that prejudice by excluding them at the end of jury selection.
When the appellate record lodged in this Court on July 1, 2010, the record did not include a transcript of voir dire. Defendant’s counsel filed his second assignment of error concomitantly with his brief on July 26, 2010. In response, the prosecutor filed a motion to supplement the record with that transcript. On August 11, 2010, this Court granted that motion and further granted Defendant an additional 40 days to file a supplemental brief. On August 30, 2010, the record was supplemented with the transcript of voir dire; a copy of the supplement was provided to Defendant to assist him in preparing any pro se brief he might choose to file. Through counsel, Defendant filed his supplemental assignment on September 20, 2010.
On appeal, Defendant argues that the trial court erred, and that he was prejudiced, by the reseating of jurors Ramsey and Williams until they were excused peremptorily by the State. Defendant argues that:
By the time these two jurors came back, the entire jury was selected, and the defense had been prejudiced by having to temper the exercise of challenges without the two peremptories it used on them, only to have them restored after the rest of the panels were seated. The defense therefore ceded control of the selection process to the State through the court’s reseating of these two jurors, and left to the state whether the defense could actually excuse these two jurors.
12nThe State argues that Defendant suffered- no prejudice from any error the court may have made because Defendant was not deprived of peremptory challenges and because the two prospective jurors in question were removed and did not serve on the petit jury.
In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that the state may not exercise a peremptory challenge to exclude a prospective juror on the basis of race. Like the state, the defendant is prohibited from using race as a basis for peremptory challenges. Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); State v. Knox, 609 So.2d 803 (La.1992). Batson has been extended to other “suspect classifications,” such as gender. See J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
*1097 La. C. Cr. P. art. 795 provides, in part:
C. No peremptory challenge made by the state or the defendant shall be based solely upon the race or gender of the juror. If an objection is made that the state or defense has excluded a juror solely.on the basis of race or gender, and a prima facie case supporting that objection is made by the objecting party, the court .may demand a satisfactory race or gender neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.
J21D. The court shall allow to stand each peremptory challenge exercised for a race or gender neutral reason either apparent from the examination or disclosed by counsel when required by the court. The provisions of Paragraph C and this Paragraph shall not apply when both the state and the defense have exercised a challenge against the same juror.
E. The court shall allow to stand each peremptory challenge for which a satisfactory racially neutral or gender neutral reason is given. Those jurors who have been peremptorily challenged and for whom no satisfactory racially neutral or gender neutral reason is apparent or given may be ordered returned to the panel, or the court may take such other corrective action as it deems appropriate under the circumstances. The court shall make specific findings regarding each such challenge.
A reviewing court owes the district judge’s evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous. State v. Breaux, 45,676 (La.App.2d Cir.11/3/10), 55 So.3d 806, 2010 WL 4336103.
The record of voir dire and subsequent argument shows that the trial court carefully considered the challenges at issue in light of the jurors’ responses and demeanor and made a reasonable choice to deny Defendant the right to excuse jurors Ramsey and Williams. Further, the court opted to allow Defendant to re-exercise these two challenges against other jurors; and, finally, these jurors did not serve on the jury. Defendant was notj^deprived of a peremptory challenge, erroneously or otherwise; therefore, none of his substantial rights were violated by the trial court’s handling of voir dire. La. C. Cr. P. Article. 921. Accordingly, this assignment of error is without merit.
Assignment of Error. No. 3: (verbatim) The Trial Court erred when it declined to grant a Mistrial in the wake of the District Attorney’s claim in oral argument that “this is the worst homicide case I’ve ever seen.”
In this assignment of error, Defendant argues that his conviction should be reversed because of a comment made by the prosecutor during rebuttal closing argument. The prosecutor stated:
You know who needs justice? That woman who had the eyes eaten out of her head by the maggots. That’s who needs justice. That shouldn’t take long, folks. Don’t y’all give a present for what he did. Y’all give him what he deserves. We hadn’t set'in this courthouse proving what he did, the most heinous crime I’ve ever seen, you’ve ever seen ...
At that point, defense counsel objected and a sidebar conference was held. When argument resumed, the prosecutor said:
Don’t let my bad taste influence your decision. Convict him. Give him life without parole.
*1098 After the jury retired to deliberate, the defense put the basis for the objection on the record:
I thought I heard him say that it is the most heinous crime that I have saw, him being the DA’s office. And in my IgjOpinion, that is a personal comment on the particular record that is—is prohibited.[3]
The prosecutor explained that he was entitled to give his opinion about how he felt about the evidence, but not about the guilt of the accused. The court considered the statement, noted that Defendant had also used the word “heinous” in argument and then observed on the record that, since the remark, the jury had come back and asked to have the definitions of the crime and responsive verdicts read again. The judge concluded that the prosecutor’s remark, even if improper, was not prejudicial to Defendant and denied Defendant’s request for a mistrial.
On appeal, Defendant argues that the remark was a prohibited reference to 1 ^matters outside the evidence and so requires reversal. La. C. Cr. P. art. 774 provides:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
| jjsThe state’s rebuttal shall be confined to answering the argument of the defendant.
Although resort to personal experience goes beyond the proper scope of a closing argument, before a case will be reversed on this basis it must be shown that the remarks influenced the jury and contributed to the verdict. State v. Minnifield, 475 So.2d 108 (La.App. 2d Cir.1985).
The prosecutor’s initial reference to the heinousness of this offense was a resort to personal experience because he said this was the most heinous crime that he had ever seen, but he quickly corrected himself to say that it was the most heinous crime that “you’ve” ever seen. This was not a comment designed to imply that the prosecutor had knowledge of evidence against Defendant that was not presented in court. The comment was a passionate argument that the evidence showed that Defendant knew that his actions were wrong and that he was not deprived of cool reflection by the actions of the victim. Indeed, the evidence showed that this was a shocking, brutal and heinous ■ crime—Defendant bludgeoned his wife to death by crushing her skull and disposed of the body in a roadside ditch. Due to the nature of the evidence, we find no possibility that the prosecutor’s limited reference to personal experience contributed to the verdict. This assignment of error is without merit.
| Assignment of Error No. 4: (verbatim) The verdict in this case violates the United States Constitution, because it was a 10 to 2 verdict. The Bill of Rights is applicable to the States by virtue of the 14th Amendment, and a non-unanimous verdict therefore should be unconstitutional. Further, the non-unanimous verdict is illogical and arbitrary, since the very fact that two persons declined to convict demonstrates there was no “proof beyond a reasonable doubt.”
This assignment of error alleges that the nonunanimous verdict is violative *1099 of Defendant’s due process rights. This is a claim that has been raised numerous times recently and this Court has rejected each claim. As this Court stated in State v. Blow, 45,415 (La.App.2d Cir.8/11/10), 46 So.3d 735:
La. Const. Art. I, § 17, provides that a case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of 12 persons, 10 of whom must concur to render a verdict. Almost identically, La. C. Cr. P. art'. 782 provides that cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of 12 jurors, 10 of whom must concur to render a verdict. Nonunanimous jury verdicts have consistently been upheld by the courts. Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972); State v. Bertrand, 2008-2215 (La.3/17/09), 6 So.3d 738.
The verdicts and sentences meet all constitutional and statutory requirements.
Accordingly, this assignment of error is without merit.

CONCLUSION

127For the foregoing reasons, the conviction and sentence of Defendant, Harold Wayne Johnson, are affirmed.
AFFIRMED.

. Large signs next to the phone inform the user that the calls are monitored and recorded.

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

. Notably, defense counsel, in closing argument, had stated, "The most heinous crime where you have taken the life of another human being, why should we sit here and listen? Because the law requires it.”